# FOR PUBLICATION



**FILED**
Nov 26 2014, 6:21 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL R. FISHER**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

NATHANIEL ARMSTRONG,           )
                               )
   Appellant-Defendant,        )
                               )
      vs.                  )     No. 49A05-1312-CR-621
                               )
STATE OF INDIANA,              )
                               )
   Appellee-Plaintiff.          )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Lisa F. Borges, Judge
Cause No. 49G04-1211-MR-80840

**November 26, 2014**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Nathaniel Armstrong appeals his criminal gang enhancement and his sentence for murder, attempted murder, and kidnapping as a class A felony. Armstrong raises four issues which we revise and restate as:

I.     Whether Ind. Code § 35-50-2-15, the criminal gang enhancement statute, is unconstitutionally vague, and whether the enhancement is disproportionate to the offense;

II.    Whether the trial court abused its discretion in admitting testimony to support the criminal gang enhancement;

III.   Whether the evidence was sufficient to support the criminal gang enhancement; and

IV.    Whether his sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

FACTS AND PROCEDURAL HISTORY

On November 15, 2012, Dominique Hamler, a local rapper who was also known as Scooter, was at his father's house having his hair braided by Alonda Wilson. Armstrong, James McDuffy, and another individual arrived and were "talking about they was going to go get whoever did something to somebody." Transcript at 308. Wilson told them that "they didn't need to do whatever they was going to do." Id. Armstrong and Hamler had a discussion about one of their friends that had been murdered. All of the men were armed and left together in a vehicle.

That same day, Thomas Keys, also known as DJ Keys, called his cousin, Marvin Finney, II, and told him that he had a project for them to work on and that someone had called him and said they wanted him to do a "tribute-type mixed tape" for a rapper named Bango, also known as Brandon McMitchell, who was killed two days earlier. Id. at 107.

2

Around 5:00 p.m., Finney and Keys entered a studio at 46th Street and Evanston in Indianapolis.

Finney saw a person he knew as D Rob from videos on Youtube, who was later identified as Dontee Robinson. McDuffy was also present, and McDuffy and Robinson spoke with Keys about McMitchell's death. McDuffy asked Keys: "What do you know about who killed Bango?" Id. at 123. Robinson then said: "I think you know something. You need to tell us who killed Bango." Id.

At some point, McDuffy asked Finney who he was texting and asked to see his phone. Finney showed McDuffy his phone and told him it was just his lady friend. At some point, McDuffy pulled a gun out and set it on his lap to let Finney and Keys know that he had a gun. Robinson "kind of showed that he had a gun, too" and displayed a rifle. Id. at 131.

McDuffy asked, "You all got any guns on you all?" Id. at 126. Finney said that he did not, and McDuffy asked to see his jacket, patted him down, and checked his book bag. McDuffy and Robinson also searched Keys. Finney noticed a third individual in the studio.

Finney asked: "What's going on?" Id. at 128. McDuffy said: "Thomas, we keep hearing that he got something to do with Bango being killed and we trying to get to the bottom of it." Id. McDuffy again said: "You're not going home until we figure out what is going on." Id. at 128. Finney said: "I don't know about no murder and stuff. We are DJ's [sic] and we do music, you know. Fighting and killing people, that ain't us. We do music. Let's get on with that." Id. at 128-129. McDuffy said: "You're not going

3

anywhere. You're not leaving." Id. at 129. Keys told Finney that he did not know why they were questioning him because "he didn't have nothing to do with it and if he did he would just tell them 'cause they was cool and they had like a friendship." Id.

Finney became nervous or concerned because the meeting had shifted from the original purpose, and Robinson was "getting kind of aggressive." Id. at 125. Finney attempted to make his way toward the door, and McDuffy talked to the third individual and said: "[H]ey, stop him right there." Id. at 132. The third individual came over with a revolver and pointed it at Finney. McDuffy told the third individual that Finney and Keys needed to be tied up. McDuffy told Finney and Keys that they needed to strip, and Finney said that he could not do that and kicked off his shoes to show that he did not have a gun or something in his shoes. McDuffy then said: "No, you need to get naked." Id. at 135.

At that point, Hamler entered the room, was "[r]eal angry," pulled a rifle out of his pants, pointed it at Finney and Keys, and said: "Who killed Bango?" Id. at 136, 138. Hamler also said: "You all need . . . to tell us what happened. You are not making it out of here." Id. at 139. Hamler and the third individual forced Finney to the floor, punched and kicked him, tied his legs together with a zip tie, and tied his wrists together. Someone kicked Keys and tied his wrists and feet together with zip ties. The questioning of Keys and Finney continued. At some point, one of the men placed toilet paper in Keys's mouth and placed duct tape over his mouth.

Hamler and the others let Armstrong in the back door of the studio, and Armstrong "came in like kind of real hyped up or amped up, like crazy." Id. at 145. Armstrong

4

referred to himself as "Little Nate," and asked: "Where they at?" Id. Armstrong said: "You all about to die tonight. You better be glad they won't let me touch the gun. You all would have been dead." Id. at 146. Armstrong "was just pacing back and forth just like real crazy." Id. Finney told him that he was DJ Freeze and that he was just there to do music, and Armstrong told him to shut up and that he did not want to hear it. Armstrong talked to Keys about who killed Bango and then grabbed a knife and cut Keys's leg, and Keys screamed.

A bald man entered the studio, and McDuffy spoke to him. The bald man spoke with McDuffy, and asked: "Is this him? Is this Thomas?" Id. at 151. McDuffy said that it was him, and they engaged in a discussion about obtaining gloves. Robinson, Hamler, Armstrong, and the bald man left and returned with gloves. The questioning continued and the men then talked among themselves about what they were going to do with Keys and Finney. The bald man said: "Drown them, electrocute them. . . . Burn them alive." Id. at 156. McDuffy said that they should release Keys and Finney because they did not know anything, and someone said: "You going to let them kill your cousin and get away with it?" Id. at 157. The men then played one of Bango's songs and danced around "like amping themselves up." Id. Armstrong said: "Tie 'em up. We about to strangle 'em. Go get the zip ties and put it around they neck." Id. at 158. Armstrong, Hamler, and the bald man put a zip tie around Finney's neck, and Finney tried to resist and place his hands by his neck. Some of the men also put a zip tie around Keys's neck, and placed duct tape around Keys's face and Finney's face. The men then left Keys and Finney in the room alone. Someone with dreadlocks entered the room and shot multiple times at

5

Keys and Finney. Keys was shot multiple times and died of a gunshot wound to the back of the chest. Finney was shot through his arms.

Finney waited probably about thirty seconds, picked his head up, did not see anyone, and attempted to free himself of the tape. Finney then told Keys that they had to leave, but Keys did not respond. Finney went out the front door to obtain help.

Gayle Young, Jr., had parked in the CVS at approximately 8:00 p.m. and observed that Finney had duct tape around his head, a zip tie around his neck, and several lacerations on both arms. Finney screamed for help and said: "I am going to die. I am going to die." Id. at 76. Finney said: "I was tied up in a house a couple of blocks down the street and they shot me and I kicked out a door or a window and ran." Id. at 76. Young told Finney to stay calm and that he would help him remove the zip tie from his neck. Young "couldn't even really get [his] finger inside [the zip tie], it was so tight around his neck." Id. at 78.

Armstrong and some of the others returned to the location where they had met earlier, and their mood was "[v]ery emotional" and happy. Id. at 340. Armstrong was "[b]ouncing around" and said: "We found the mother f------." Id. Armstrong also said that "they had duct taped them and zip tied them and worked them over" and that "they shut off the lights and let them have it." Id. at 348. Either Armstrong or Hamler said "they had got the n-----." Id. at 311. Armstrong was "happy, vigilant, very emotional about it." Id. at 342.

On November 29, 2012, the State charged Armstrong with Count I, murder; Count II, murder; Count III, kidnapping as a class A felony; Count IV, attempted murder as a

6

class A felony; Count V, robbery as a class A felony; Count VI, criminal confinement as a class B felony; Count VII, conspiracy to commit kidnapping as a class A felony; and Count VIII, conspiracy to commit criminal confinement as a class B felony. That same day, the State also filed a criminal gang enhancement alleging that Armstrong, as a member of a criminal gang, the Luchiana Boyz, committed the offense of murder and/or kidnapping and/or criminal confinement and committed the felony offense(s) at the direction of or in affiliation with the criminal gang.

On October 21, 2013, a jury trial began. On October 24, 2013, the jury found Armstrong guilty of Counts I, II, III, IV, and VI, and not guilty of Count V. The jury did not reach a verdict for Counts VII and VIII, and the State dismissed those charges.

On October 25, 2013, Armstrong filed a verified waiver of trial by jury with respect to the criminal gang enhancement. On November 22, 2013, the court held a trial as to the criminal gang enhancement and sentencing hearing. The court incorporated the trial testimony and the jury verdict. The State introduced State's Exhibit 1 consisting of a charging information from a prior cause alleging that Armstrong actively participated in a criminal gang, a probable cause affidavit related to the charge, and a plea agreement in which Armstrong pled guilty. Armstrong's counsel objected on the basis that the prejudicial effect outweighed the probative value. The court admitted State's Exhibit 1 over the objection. Indianapolis Metropolitan Police Detectives Jose Torres and Steven Schafer testified regarding Armstrong's involvement in the Luchiana Boyz. Armstrong's counsel objected to the detectives' testimony regarding whether McMitchell was a member of the Luchiana Boyz, and the court overruled the objections. The court found

7

that the evidence substantiated and met the burden required for the criminal gang enhancement, and found Armstrong's criminal history, substance abuse, and nature of the offense as aggravators. With respect to the latter, the court stated:

> If you just look at the evidence that was presented, the victims were zip tied, duct taped, their whole head duct taped so possibly even been suffocating, they were basically tortured and not just a little bit of torture but for hours. So the nature of the offense is extremely aggravating, much greater than the elements that are necessary to prove. And I do think that [Armstrong's] actions in whipping up the crowd, which is basically what he's always done, may have contributed to the murder itself. He may have been, you know, what, what got everyone to that fever pitch. I don't know if [Armstrong's] the one that pulled the trigger, I don't know that. But I know that the goal was to see Thomas Keys and Marvin Finney pay for what [Armstrong] believed was the death of his friend, Bango.

Id. at 900-901. The court found Armstrong's youth and the fact that he had a son as mitigators. The court stated:

> As to Count 1, it's hard for me not to, you know, the maximum sentences are reserved for people that are considered to be the worst of the worst. I haven't seen worse than this. I'm not saying that [Armstrong] can never be a valuable person, but I'm saying his history, the aggravators that are here and the crime that, that occurred was the worst of the worst.

Id. at 901.

The court sentenced Armstrong to sixty-five years for Count I, murder, enhanced by sixty-five years for the criminal gang enhancement, thirty years for Count III, kidnapping as a class A felony; and forty-five years for Count IV, attempted murder. The court ordered that Count III be served concurrent with Count I and Count IV be served consecutive to Count I for an aggregate sentence of 175 years.

8

DISCUSSION

I.

The first issue is whether Ind. Code § 35-50-2-15, the criminal gang enhancement statute, is unconstitutionally vague, and whether the enhancement is disproportionate to the offense. Armstrong argues that the statute is unconstitutionally vague because it fails to clearly define what conduct is prohibited. Specifically, he argues that the statute does not define the phrase "in affiliation with." Appellant's Brief at 16. He also asserts that the statute violates the Proportionality Clause of the Indiana Constitution because the punishment it imposes is excessive and grossly out of proportion to the severity of the crime and unconstitutional as applied to Armstrong.

The State argues that the statute is constitutional and not vague because Armstrong cannot sensibly claim that he did not realize that such membership and illegal conduct was not encompassed by the statute. The State also argues that it is not necessary that this court impose a requirement that a defendant must have acted with a specific intent to further the gang's criminal goals to support a criminal gang enhancement. It contends that the criminal gang enhancement applies because of the defendant's gang membership and the connection to the felony. It also argues that the statute is not disproportionate under either the United States Constitution or Indiana Constitution.

At the time of the offenses, Ind. Code § 35-50-2-15 provided in part:

(b)     The state may seek, on a page separate from the rest of a charging instrument, to have a person who allegedly committed a felony offense sentenced to an additional fixed term of imprisonment if the state can show beyond a reasonable doubt that the person knowingly or intentionally:

9

(1)     was a member of a criminal gang while committing the offense; and

(2)     committed the felony offense at the direction of or in affiliation with a criminal gang.

\* \* \* \* \*

(d)     If the jury (if the hearing is by jury) or the court (if the hearing is to the court alone) finds that the state has proved beyond a reasonable doubt that the person knowingly or intentionally was a member of a criminal gang while committing the felony offense and committed the felony offense at the direction of or in affiliation with a criminal gang as described in subsection (b), the court shall:

(1)     sentence the person to an additional fixed term of imprisonment equal to the sentence imposed for the underlying felony, if the person is sentenced for only one (1) felony; or

(2)     sentence the person to an additional fixed term of imprisonment equal to the longest sentence imposed for the underlying felonies, if the person is being sentenced for more than one (1) felony.

(e)     A sentence imposed under this section shall run consecutively to the underlying sentence.

(f)     A term of imprisonment imposed under this section may not be suspended.

(Subsequently amended by Pub. L. 158-2013, § 666, eff. July 1, 2014).

The constitutionality of statutes is reviewed *de novo*. Conley v. State, 972 N.E.2d 864, 877 (Ind. 2012) (citing State v. Moss-Dwyer, 686 N.E.2d 109, 110 (Ind. 1997)), reh'g denied. "Such review is 'highly restrained' and 'very deferential,' beginning 'with [a] presumption of constitutional validity, and therefore the party challenging the statute labors under a heavy burden to show that the statute is unconstitutional.'" Id. (citing Moss-Dwyer, 686 N.E.2d at 111-112). We address separately Armstrong's claims regarding whether the statute is vague and whether the enhancement is disproportionate.

10

A.    Vagueness

Under basic principles of due process, a law is void for vagueness if its prohibitions are not clearly defined. Klein v. State, 698 N.E.2d 296, 299 (Ind. 1998) (citing Grayned v. City of Rockford, 408 U.S. 104, 92 S. Ct. 2294 (1972)). A statute is also void for vagueness if its terms invite arbitrary or discriminatory enforcement. Id. (citing Kolender v. Lawson, 461 U.S. 352, 103 S. Ct. 1855 (1983)). In other words, a criminal statute may be invalidated for vagueness for either of two independent reasons: (1) for failing to provide notice enabling ordinary people to understand the conduct that it prohibits; and (2) for the possibility that it authorizes or encourages arbitrary or discriminatory enforcement. Brown v. State, 868 N.E.2d 464, 467 (Ind. 2007) (citing City of Chicago v. Morales, 527 U.S. 41, 56, 119 S. Ct. 1849, 1859 (1999); Healthscript, Inc. v. State, 770 N.E.2d 810, 815-816 (Ind. 2002)). "A related consideration is the requirement that a penal statute give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden so that 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" Id. (quoting Healthscript, Inc., 770 N.E.2d at 816 (quoting United States v. Harriss, 347 U.S. 612, 617, 74 S. Ct. 808, 812 (1954))). In State v. Downey, the Court emphasized that "there must be something in a criminal statute to indicate where the line is to be drawn between trivial and substantial things so that erratic arrests and convictions for trivial acts and omissions will not occur. It cannot be left to juries, judges, and prosecutors to draw such lines." 476 N.E.2d 121, 123 (Ind. 1985), reh'g denied. "Accordingly, the statutory language must 'convey sufficiently definite warning as to the proscribed conduct when

11

measured by common understanding.'" Id. (quoting Rhinehardt v. State, 477 N.E.2d 89, 93 (Ind. 1985)).

"A statute is not void for vagueness if individuals of ordinary intelligence could comprehend it to the extent that it would fairly inform them of the generally proscribed conduct." Klein, 698 N.E.2d at 299. The statute does not have to list specifically all items of prohibited conduct; rather, it must inform the individual of the conduct generally proscribed. Brown, 868 N.E.2d at 467. The examination of a vagueness challenge is performed in light of the facts and circumstances of each individual case.[1] Id.

Armstrong's vagueness claim focuses on the phrase "in affiliation with." To determine whether the vagueness doctrine applies, we consider this phrase in context. The statute does not provide a particular definition for "affiliation." In our evaluation of the vagueness claim, which hinges upon how ordinary people understand statutory language, we prefer to consult standard dictionaries. "Affiliation" is generally defined as the "act of affiliating; state of being affiliated or associated." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED EDITION 24 (1967). "Affiliate" is defined as "to bring into close association or connection," "to attach or unite on terms of fellowship," and "to associate oneself; be intimately united in action or interest." Id. The statute requires the court to enhance a sentence only when the court finds that the State has proven beyond a reasonable doubt that the person knowingly or intentionally

---

[1] Armstrong appears to argue only that the criminal gang activity statute is unconstitutionally vague under the United States Constitution and cites various federal cases. He also cites Klein v. State, which held that the defendant waived any claim under the Indiana Constitution when he did not present any separate argument based on the Indiana Constitution. 698 N.E.2d 296, 299 (Ind. 1998). Accordingly, we address his claim under only the United States Constitution.

12

was a member of a criminal gang while committing the felony offense and committed the felony offense at the direction of or in affiliation with a criminal gang. The statute fairly informs a person of ordinary intelligence of the conduct which is forbidden. We cannot say that the statute is unconstitutionally vague.

B.     Proportionality

Armstrong argues that the statute violates the Proportionality Clause of the Indiana Constitution, Article 1, Section 16, as well as the Eighth Amendment of the United States Constitution. "The Eighth Amendment's bar on 'cruel and unusual' punishments has been held to implicitly prohibit certain 'grossly disproportionate punishments.'" Knapp v. State, 9 N.E.3d 1274, 1289 (Ind. 2014) (quoting Solem v. Helm, 463 U.S. 277, 288, 103 S. Ct. 3001 (1983)), cert. pending.[2] "But our Constitution by its terms *expressly* requires proportionality: 'Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense.'" Id. The Indiana Supreme Court has held "that this provision 'goes beyond' Eighth Amendment protections . . . and permits us 'to review the duration of [a] sentence as it is possible for the statute under which [an] appellant is convicted to be constitutional, and yet be unconstitutional as applied . . . in [a] particular instance.'" Id. (quoting Clark v. State, 561 N.E.2d 759, 765 (Ind. 1990)). We thus begin our analysis with the more-protective state standard.

1.     Article 1, Section 16

Article 1, Section 16 provides that "[a]ll penalties shall be proportioned to the nature of the offense." "Though Article 1, Section 16 sweeps somewhat more broadly

_____

[2] The defendant in Knapp filed a petition for certiorari on November 7, 2014.

13

than the Eighth Amendment, its protections are still narrow." Id. It is violated only when the criminal penalty is not graduated and proportioned to the nature of the offense. Id. Though we "cannot set aside a legislatively sanctioned penalty merely because it seems too severe," Article 1, Section 16 requires us to review whether a sentence is not only within statutory parameters, but also constitutional as applied to the particular defendant. Id. at 1290. Our standard for an as-applied proportionality challenge depends on the type of penalty at issue. Id. For habitual-offender enhancements, we assess the nature and gravity of the present felony, and then the nature of the prior felonies on which the enhancement is based, while for penalties not based on prior offenses, we have undertaken a simpler inquiry into whether the penalty is graduated and proportioned to the nature of the offense. Id.

Because Armstrong's sentence was enhanced under the criminal gang enhancement statute which does not necessarily involve prior criminal history, we apply the standard of whether the penalty is graduated and proportioned to the nature of the offense. The criminal gang enhancement statute provides that the enhancement shall equal the sentence imposed for the underlying felony if the person is sentenced for only one felony, or the longest sentence imposed for the underlying felonies if the person is being sentenced for more than one felony. See Ind. Code § 35-50-2-15(d). Given that the criminal gang enhancement statute is graduated and proportioned to the nature of the offense and in light of the circumstances surrounding the murder, we cannot say that the enhancement violates Article 1, Section 16.

14

2. <u>Eighth Amendment</u>

Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare, because in non-capital cases, the Eighth Amendment contains only a narrow proportionality principle. <u>Knapp</u>, 9 N.E.3d at 1291. Armstrong does not point to any authority holding that a sentence based upon a criminal gang enhancement statute is unconstitutional under the Eighth Amendment. Given the gravity of the offenses as well as the evidence that Armstrong was a member of a criminal gang, we cannot say that his sentence violates the Eighth Amendment.

II.

The next issue is whether the trial court abused its discretion in admitting testimony to support the criminal gang enhancement. Generally, we review the trial court's ruling on the admission of evidence for an abuse of discretion. <u>Noojin v. State</u>, 730 N.E.2d 672, 676 (Ind. 2000). We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. <u>Joyner v. State</u>, 678 N.E.2d 386, 390 (Ind. 1997), <u>reh'g</u> <u>denied</u>. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. <u>Fox v. State</u>, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), <u>reh'g</u> <u>denied</u>, <u>trans.</u> <u>denied</u>. To the extent Armstrong raises issues of constitutional law, we review his claim *de novo* and any error must be harmless beyond a reasonable doubt. <u>See</u> <u>Morales v. State</u>, 749 N.E.2d 1260, 1267 (Ind. Ct. App. 2001).

15

Armstrong argues that Detective Schafer had no personal knowledge of the Luchiana Boyz and everything he testified to was information he acquired from others' investigations. He asserts that Detective Schafer was improperly permitted to testify about the activities of the Luchiana Boyz that he had read about in police reports prepared by other officers, which he alleges included hearsay evidence that the gang was involved in various criminal activities, "and totally speculative hearsay about gang retaliation." Appellant's Brief at 10. He contends that the record does not demonstrate that Detective Schafer was qualified as an expert and he did not purport to have used any particular skill. He also contends that the admission of the hearsay statements violated his rights under the Sixth Amendment.

The State argues that Armstrong waived review of this issue by not moving to strike Detective Schafer's testimony regarding whether McMitchell was a member of the Luchiana Boyz and by failing to object to testimony that McMitchell was a gang member of Luchiana Boyz. The State also argues the court properly admitted Detective Schafer's testimony. It contends that the dispute in this case regarding membership in gangs is not a matter of scientific principles governed by Ind. Evidence Rule 702(b) and is more a matter of the observations of persons with specialized knowledge. The State also argues that even if the admission was erroneous, it was harmless because the important issues were whether Armstrong was a gang member at the time of the shooting and whether he acted in affiliation with a criminal gang.

To the extent that Armstrong raises the Sixth Amendment on appeal, we observe that his objections were based upon hearsay and he did not specifically mention the Sixth

16

Amendment. A party may not object to the admission of evidence on one ground at trial and seek reversal on appeal based on a different ground. Malone v. State, 700 N.E.2d 780, 784 (Ind. 1998). Consequently, Armstrong's claim is waived. See Boatner v. State, 934 N.E.2d 184, 187 (Ind. Ct. App. 2010). Waiver notwithstanding, we cannot say that Armstrong's arguments based upon the Sixth Amendment or hearsay warrant reversal.

At the time of the trial, Ind. Code § 35-50-2-15(g) provided:

For purposes of subsection (c), evidence that a person was a member of a criminal gang or committed a felony at the direction of or in affiliation with a criminal gang may include expert testimony pursuant to the Indiana Rules of Evidence that may be admitted to prove that particular conduct, status, and customs are indicative of criminal gang activity. The expert testimony may include the following:

> (1) Characteristics of persons who are members of criminal gangs.
> (2) Descriptions of rivalries between criminal gangs.
> (3) Common practices and operations of criminal gangs.
> (4) Behavior of criminal gangs.
> (5) Terminology used by members of criminal gangs.
> (6) Codes of conduct, including criminal conduct, of particular criminal gangs.
> (7) Types of crimes that are likely to be committed by a particular criminal gang.

(Subsequently amended by Pub. L. 158-2013, § 666, eff. July 1, 2014).[3]

---

[3] The current version of Ind. Code § 35-50-2-15(g) provides:

For purposes of subsection (c), evidence that a person was a member of a criminal gang or committed a felony at the direction of or in affiliation with a criminal gang may include the following:

> (1) An admission of criminal gang membership by the person.
> (2) A statement by:
>
> > (A) a member of the person's family;
> > (B) the person's guardian; or
> > (C) a reliable member of the criminal gang;

17

We observe that Ind. Code § 35-50-2-15(g) provided that evidence that a person was a member of a criminal gang or committed a felony at the direction of or in affiliation with a criminal gang "*may* include expert testimony pursuant to the Indiana Rules of Evidence that may be admitted to prove that particular conduct, status, and customs are indicative of criminal gang activity." (Emphasis added). The statute did not preclude other evidence. Where the word "may" is used, it "ordinarily implies a permissive condition and a grant of discretion." Alden v. State, 983 N.E.2d 186, 189 (Ind. Ct. App. 2013), trans. denied.

At the time of trial, Ind. Evidence Rule 702, which governs testimony by expert witnesses, provided in pertinent part:

(a)     If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(Subsequently amended eff. January 1, 2014).

At the time of the trial, Ind. Evidence Rule 701, which governs opinion testimony by lay witnesses, provided: "If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences

---

stating the person is a member of a criminal gang.

(3)     The person having tattoos identifying the person as a member of a criminal gang.
(4)     The person having a style of dress that is particular to members of a criminal gang.
(5)     The person associating with one (1) or more members of a criminal gang.
(6)     Physical evidence indicating the person is a member of a criminal gang.
(7)     An observation of the person in the company of a known criminal gang member on multiple occasions.
(8)     Communications authored by the person indicating criminal gang membership.

18

which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."

While Armstrong argues on appeal that the record in no way demonstrates that Detective Schafer was qualified as an expert by knowledge, skill, experience, training or education, or that he possessed any scientific, technical, or other specialized knowledge, we observe that his trial counsel acknowledged that the court recognized Detective Schafer as an expert to some extent. Specifically, following Detective Schafer's testimony that his opinion was that the murder of Keys was done in retaliation for the death of McMitchell, Armstrong's trial counsel stated:

> *I understand you're recognizing him as an expert* but I think this goes further than he should be able to go. He's not a scientific expert and I don't think he should be able to testify about an ultimate legal issue and in this particular circumstance, the ultimate legal issue would be that this murder was committed at the direction or an affiliation with the said criminal group, Luchiana Boyz.

Transcript at 852 (emphasis added).

Detective Schafer testified that he worked as a police officer for the City of Indianapolis for seventeen years, worked in the criminal gang unit from 2002 until 2012, and attended training by the Indiana State Police, the Indianapolis Police Department, the United States Attorney General's Office, and private training by places such as "No Gangs, an internet gang forum." Id. at 835-836. He testified that he was familiar with local gangs, their conduct, membership, operation, and locations through his training and experience in the gang unit. He indicated that he testified as a gang expert in Marion County at least twice. He testified that he was a general detective, investigated gang activity, and attempted to identify and dismantle criminal gangs. He testified that he was

19

specifically familiar with a group of individuals known as the Luchiana Boyz. When asked to explain the basis of his knowledge of the Luchiana Boyz, Detective Schafer answered:

> Throughout my time with the criminal gang unit, the Luchiana Boyz basically came into our purview, we started receiving information on the group. I was just one of the assisting detectives on at least one, if not two of the search warrants that I know that were done in that, in the area for Luchiana Boyz, the Luchiana Boyz gang members. I've also assisted in a couple of different investigation involving the Luchiana Boyz specifically assisting Detective Derek Harris, who was one of the primary detectives working on them. As well as homicide detectives reference, I believe, the underlying case for this. And then just multiple times of, because a lot of, now that I'm in the digital computer forensics unit, a lot of what I did was a lot of online social networking investigations where I would also, I could view publically accessible pages on social networks for members of the group.

Id. at 838-839. Based upon Detective Schafer's experience and training, we conclude that he qualified as an expert witness.

However, even if we determined that Detective Schafer was not an expert witness and that the court improperly admitted his testimony that McMitchell was a member of the Luchiana Boyz, we conclude that any error would be harmless in light of other evidence, including Detective Schafer's other testimony which was either not objected to by Armstrong or was otherwise admissible, the testimony of Detective Torres, and State's Exhibit 1.

Without specific objection, Detective Schafer testified that the predominant area of the Luchiana Boyz was north of the Indiana State Fairgrounds and that, after McMitchell's death, "they posted a great deal of like R, RBTF, or rest behind the fairgrounds, which is their way of paying respect to him." Id. at 844-845. The location

20

of the offenses was 46th and Evanston, which is north of the Indiana State Fairgrounds. Detective Schafer explained that RBTF meant "rest behind the fairgrounds, it's more of a reference to, again, their area, their turf, the gang itself." Id. at 845. He also testified that "[t]hey would also put rest on Luchi, which is just short for Luchiana Boyz." Id. at 845.

While at one point, Armstrong's counsel objected to "any hearsay testimony," the prosecutor later asked Detective Schafer regarding "some of the common practices and some of the . . . characteristics you've seen in gangs in terms of the activities that they are involved in" and whether "[o]ftentimes you will have a gang member murdered, correct, or killed in the line of whatever it is that they're doing, selling drugs or whatnot," and Detective Schafer answered affirmatively and testified that it is common to have retaliation for gang murders. Id. at 848-849.

Detective Torres testified that McMitchell and Armstrong were associated with each other. The day after Keys's murder, Armstrong mentioned that he was part of the Luchiana Boyz or Luchi for short and that he had been "with them since we made Luchi." Id. at 831. Detective Torres testified that Armstrong "mentioned at several parts in the, in the statement where he referenced Luchi, Luchiana, and also mentioning other gang members in the statement, as well as other gangs." Id. Armstrong also talked about "[b]eing a part of this group." Id. On cross-examination, Detective Torres indicated that Armstrong did not specifically indicate that he was going to do something in furtherance of revenge for McMitchell's murder but was "very frustrated." Id. at 833. The court also admitted State's Exhibit 1, which Armstrong does not challenge on appeal, consisting of a charging information alleging that Armstrong actively participated in a criminal gang, a

probable cause affidavit related to the charge, and a plea agreement dated 2010 in which Armstrong pled guilty. Based upon the record, we conclude that any error in the admission of Detective Schafer's testimony that McMitchell was a member of the Luchiana Boyz is harmless, and reversal is not warranted on this basis.

III.

The next issue is whether the evidence was sufficient to support the criminal gang enhancement. When reviewing the sufficiency of the evidence, we must consider only the probative evidence and reasonable inferences supporting the verdict. Drane v. State, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess witness credibility or reweigh the evidence. Id. We consider conflicting evidence most favorably to the trial court's ruling. Id. We affirm the unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." Id. (quoting Jenkins v. State, 726 N.E.2d 268, 270 (Ind. 2000)). It is not necessary that the evidence overcome every reasonable hypothesis of innocence. Id. at 147. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. Id.

At the time of the offense, Ind. Code § 35-50-2-15(d) provided that a court shall sentence a person to an additional fixed term if the court "finds that the state has proved beyond a reasonable doubt that the person knowingly or intentionally was a member of a criminal gang while committing the felony offense and committed the felony offense at the direction of or in affiliation with a criminal gang . . . ." A "criminal gang" means a group with at least three members that specifically: "(1) either: (A) promotes, sponsors, or assists in; or (B) participates in; or (2) requires as a condition of membership or

22

continued membership; the commission of a felony or an act that would be a felony if committed by an adult or the offense of battery (IC 35-42-2-1)." Ind. Code § 35-50-2-1.4.

Armstrong argues that the only witness to the commission of the underlying crimes did not in any way suggest the presence of a gang or gang member during the entire ordeal at the music studio. He asserts that while the record of conviction for criminal gang activity in 2009 may show that Armstrong was a member of the Luchiana Boyz in 2009 and the testimony of Detective Torres indicates that he was a member of the Luchiana Boyz at some time, his testimony does not specify when. He also contends that there is absolutely no showing that Armstrong committed the offense at the direction of or in affiliation with a criminal gang.

With respect to Armstrong's status as a gang member, State's Exhibit 1 includes a charging information for cause number 49F18-1004-FD-031719 which alleged in part that Armstrong on or about October 31, 2009, knowingly or intentionally actively participated in a criminal gang, "that is: [']The Luchiana Boyz' aka 'The Luchi Boyz,' a group with at least three (3) members that promotes, sponsors, or assists in; or participates in an act that would be a felony i[f] committed by an adult or the offense of battery; to wit: criminal recklessness and/or intimidation and/or attempted battery with a deadly weapon." State's Exhibit 1. The exhibit also contained a plea agreement in which Armstrong pled guilty to criminal gang activity as a class D felony.

Moreover, Detective Torres testified that he came into contact with Armstrong on November 16, 2012, the day after the present offenses, that he had a conversation with

23

Armstrong in which Armstrong mentioned that he was a part of the "Luchi" which is also known as the "Luchiana Boyz." Transcript at 830. Detective Torres testified that Armstrong said that he had been "with them since we made Luchi." Id. at 831. Detective Torres testified that Armstrong referenced Luchiana and other gang members as well as other gangs. The prosecutor asked Detective Torres: "Is he talking about just knowing these people or actually being a part of this particular group?" Id. Detective Torres answered: "Being a part of this group. Also called it an entertainment group, ENT. It's another reference for a gang that's being used." Id.

To the extent that Armstrong argues that he did not commit the offense at the direction of or in affiliation with a criminal gang, the record further reveals that Detective Torres testified that Armstrong knew of McMitchell's murder and "was very frustrated." Id. at 833. Detective Schafer testified that the predominant area of the Luchiana Boyz was north of the Indiana State Fairgrounds and that, after McMitchell's death, "they posted a great deal of like R, RBTF, or rest behind the fairgrounds, which is their way of paying respect to him." Id. at 844-845. He explained that RBTF meant "rest behind the fairgrounds, it's more of a reference to, again, their area, their turf, the gang itself." Id. at 845. He also testified that "[t]hey would also put rest on Luchi, which is just short for Luchiana Boyz." Id. at 845. At trial, Finney testified that he and Keys were repeatedly questioned regarding McMitchell's death.

Based upon the record, we conclude that the State presented sufficient probative evidence that Armstrong was a member of a criminal gang while committing the offense and committed the felony offense at the direction of or in affiliation with a criminal gang.

24

The next issue is whether Armstrong's sentence is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

Armstrong concedes that there is no doubt that the crimes were reprehensible acts motivated by a desire for revenge, but argues that there is no showing that he was the one who actually shot the two victims. He asserts that there was nothing to indicate that he was the worst of offenders and points out that he was only twenty-one years old at the time of the offenses.

Our review of the nature of the offense reveals that Armstrong, who was twenty-one years old at the time, had a discussion about going to "get" somebody. Transcript at 308. Keys and Finney were lured to a studio where they were repeatedly questioned, punched, and kicked. They had their legs and wrists tied with zip ties and duct tape was placed around their heads. Armstrong told them that they were going to die, was "hyped up or amped up," and grabbed a knife and cut Keys's leg. Id. at 145. Armstrong said: "Tie 'em up. We about to strangle 'em. Go get the zip ties and put it around they neck." Id. at 158. Armstrong and others put a zip tie around Finney's neck, and Finney tried to resist and place his hands by his neck. The zip tie around Finney's neck was so tight that

25

the paramedic had to remove it.  After the murder, Armstrong was "happy, vigilant, very emotional about it," was "[b]ouncing around," and said: "We found the mother f------." Id. at 340, 342.  Armstrong also said that "they had duct taped them and zip tied them and worked them over" and that "they shut off the lights and let them have it."  Id. at 348.

Our review of the character of the offender reveals that Armstrong has an extensive criminal history.  As a juvenile, he was alleged to have committed criminal mischief in 2004 and disorderly conduct, which was amended to battery in 2005, but these charges were dismissed.  In 2005, he was adjudicated a delinquent for offenses that if committed by an adult would constitute criminal mischief as a class D felony and two counts of battery as class A misdemeanors.  That same year, he was alleged to have committed criminal trespass as a class A misdemeanor, battery as a class A misdemeanor, criminal mischief as a class A misdemeanor, and criminal recklessness as a class B misdemeanor, but these allegations were dismissed.

In 2006, he was adjudicated a delinquent for fleeing law enforcement as a class A misdemeanor.  He was also alleged to have committed criminal trespass as a class A misdemeanor, unlawful entry of a motor vehicle as a class B misdemeanor, and criminal mischief as a class B misdemeanor, but these allegations were dismissed.

In 2007, Armstrong was adjudicated a delinquent for two counts of fleeing law enforcement as class A misdemeanors, escape as a class D felony, auto theft as a class D felony, and criminal mischief as a class C felony.  He was also alleged to have committed criminal trespass as a class A misdemeanor, unlawful entry of a motor vehicle as a class B misdemeanor, criminal mischief as a class B misdemeanor, and operating a motor

26

vehicle while never having received a license as a class C misdemeanor, but these charges were dismissed.

In 2008, he was adjudicated a delinquent for auto theft as a class D felony, resisting law enforcement as a class D felony, and operating a motor vehicle while never having received a license as a class C misdemeanor. In 2009, he was adjudicated a delinquent for fleeing law enforcement as a class A misdemeanor, and allegations of criminal trespass as a class A misdemeanor and unlawful entry of a motor vehicle as a class B misdemeanor were dismissed.

As an adult, the State charged Armstrong with disorderly conduct as a class B misdemeanor, but the charge was dismissed due to evidentiary problems. In 2010, Armstrong was convicted of resisting law enforcement as a class A misdemeanor, and the court sentenced him to 365 days with 363 days suspended and 180 days probation. The court revoked Armstrong's probation after he failed to report to the probation department intake unit as directed, was arrested for possession of marijuana, failed to report to the drug lab as directed by probation, and tested positive for THC. That same year, he was convicted of criminal gang activity as a class D felony, carrying a handgun without a license as a class A misdemeanor, and possession of marijuana as a class A misdemeanor.

In 2011, the State charged Armstrong with driving while suspended as a class A misdemeanor and operating a motor vehicle while never having received a license as a class C misdemeanor, but these charges were dismissed, and the presentence investigation report ("PSI") notes "Police Officer Unavailable." PSI at 9. In 2012, he was convicted of resisting law enforcement as a class A misdemeanor. At the time of the

27

current offense, he had pending charges for two counts of operating a motor vehicle while never having received a license as class C misdemeanors.

The PSI summarizes Armstrong's legal history as being arrested as a juvenile on seventeen occasions including seven felony arrests resulting in five felony true findings, nine misdemeanor arrests resulting in five misdemeanor true findings, and one status offense which resulted in no action taken. The PSI indicates that Armstrong was arrested as an adult on twelve occasions resulting in three misdemeanor convictions and one felony conviction. The PSI also states that his overall risk assessment score places him in the very high risk category to reoffend.

According to the PSI, Armstrong stated he moved in with his grandmother after his parents separated when he was six years old. He moved out of his home when he was seventeen "because he 'got [his] own crib.'" Id. at 12. He described having a good relationship with his family during his formative years and at the present time and denied ever suffering any form of abuse. He reported being the father of one child born on May 31, 2011, and the mother of the child maintains custody. Armstrong reported using alcohol to the point of having blackouts and using marijuana on a daily basis. He also admitted to using K2 (spice) on the date of the instant offenses and generally used five or six packs on a daily basis.

After due consideration of the trial court's decision and in light of the brutal nature of the offenses and Armstrong's criminal history, we cannot say that the sentence imposed by the trial court is inappropriate in light of the nature of the offense and the character of the offender.

## CONCLUSION

For the foregoing reasons, we affirm the criminal gang enhancement and Armstrong's sentence.

Affirmed.

BARNES, J., and BRADFORD, J., concur.