

FILED

Apr 17 2020, 6:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

ATTORNEY FOR APPELLANT

P. Jeffrey Schlesinger
Appellate Division
Office of the Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

Angel Garcia-Berrios,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 17, 2020

Court of Appeals Case No.
19A-CR-2405

Appeal from the Lake Superior
Court

The Honorable Samuel L. Cappas,
Judge

Trial Court Cause No.
45G04-1703-MR-2

---

**Brown, Judge.**

[1] Angel Garcia-Berrios appeals his convictions for murder and battery by means of a deadly weapon as a level 5 felony and his criminal gang enhancement. We affirm.

*Facts and Procedural History*

[2] On January 24, 2016, Garcia-Berrios, Rolando Manuel Leal, Jr.,[1] and Rito Maciel, Jr.,[2] went to a bar in East Chicago, and at some point Thaddeus Rodriguez, Jr.,[3] contacted Maciel. Garcia-Berrios had a problem with Rodriguez and believed he had stolen a gold chain from his sister. Garcia-Berrios, Leal, and Maciel left the bar and drove around as Rodriguez and Maciel exchanged messages. Leal stopped the vehicle, retrieved a nine-millimeter Smith & Wesson and a nine-millimeter Glock from a door in the vehicle, and gave the Smith & Wesson to Garcia-Berrios. Maciel placed Rodriguez on speakerphone, and at some point Rodriguez revealed his location. The men drove to near the location and parked, and Leal and Garcia-Berrios exited the vehicle and told Maciel to stay in the vehicle.

[3] At some point, Rodriguez walked out of a residence, and Jesus Acosta, who was a neighbor outside making a phone call, greeted him. Garcia-Berrios and

---

[1] Leal was a member of the Renegade Imperial Gangsters.

[2] Maciel was a member of Gangster Two Six.

[3] Rodriguez was a member of Renegade Two Six.

Leal ran towards Rodriguez and Acosta carrying their guns. Garcia-Berrios said "Merry Christmas . . . mother-f-----" and shot Rodriguez multiple times. Transcript Volume IV at 35. Leal grabbed Acosta, struck him on the head with his gun, took him between two houses, threw him on the ground, and shot at him three times, striking him in the leg. Garcia-Berrios and Leal ran back to their vehicle and drove away. As they rode away, Garcia-Berrios said "[y]ou should've seen the look in his eyes when he seen me," "I told him, Merry Christmas, mother-f-----," and "he shouldn't have stole . . . my sister's chain." Transcript Volume V at 143. Rodriguez's friend and neighbors called 911. A friend took Acosta to the hospital. Police responded and found Rodriguez unresponsive.

[4] Leal later gave the nine-millimeter Smith & Wesson to Luis Perez-Correa and told him to "get rid of the weapon because it was used on that Thaddeus thing." *Id.* at 9. Police later discovered the gun following a traffic stop of Perez-Correa. Further, law enforcement obtained a recorded conversation between Maciel and Leal in which Leal stated that he and a person by the name of "Angel" were at the scene of Rodriguez's murder. Transcript Volume VI at 57. Rodriguez's friend reported to police that, before he went outside, Rodriguez had been on the phone and referred to a person with the name of Angel, he did not state a last name, and she knew a person named Angel Feliciano. Police eliminated Feliciano as a suspect after confirming he was at work at the time of the murder. Six recovered nine-millimeter spent casings and other bullet fragments were determined to have been shot from the Smith & Wesson.

[5]     The State charged Garcia-Berrios with: Count I, murder of Rodriguez; Count II, battery by means of a deadly weapon of Acosta as a level 5 felony; and Count III, criminal gang activity as a level 6 felony. It also filed an information alleging a criminal gang enhancement. Garcia-Berrios filed a motion in limine requesting the court to exclude the audio recording of Leal made by Maciel. After hearing argument, the court stated the recording did not contain statements in furtherance of a conspiracy. The State responded the recording could potentially be used for rebuttal if the defense were to open the door, and the court agreed.

[6]     During trial, defense counsel argued in his opening statement that Maciel gave law enforcement Garcia-Berrios's name, "[t]he difficulty with that is other information surfaces over the course of the months after Thaddeus Rodriguez's murder, which includes information about Rolando Leal and his crew called EBK crew, which stands for Everybody Killer crew," "Leal and the three other members of that crew were implicated in some way by some source that made it to the detectives," and "[v]irtually no investigation was done to eliminate those -- that crew as the culprits here." Transcript Volume III at 156-157. Perez-Correa testified on cross-examination by defense counsel that Richie Campos, Josue Anaya, and Dequan Birdsong were members of Leal's crew called "EBK," which stood for "Everybody killer." Transcript Volume V at 16-17. Perez-Correa indicated that, after his arrest with the gun he received from Leal, he gave law enforcement the names of Leal, Campos, Anaya, and Birdsong as the actors in Rodriguez's murder. On redirect examination, Perez-Correa

testified that he heard the information about Leal, Campos, Anaya, and Birdsong from Leal. The State moved to use the recording of Leal, stated Perez-Correa indicated he obtained his information about the EBK being present at the time of the murder from Leal, and argued it should be able to use the recording to show Leal and "Angel" were the only two people present at the time of the murder. *Id*. at 27. The court took the request under advisement. Later, during Maciel's testimony, the court told defense counsel "if you start saying . . . those four guys were involved . . . then I'm going to let [the prosecutor] play this," and defense counsel replied, "I understand." *Id*. at 157.

[7]    On cross-examination of Hammond Police Detective Stuart Hinson, defense counsel asked if he was aware of "the information Luis Perez-Correa offered up . . . about Rolando Leal and the EBK crew's involvement," and Detective Hinson responded that Birdsong had already been eliminated as a suspect. Transcript Volume VI at 33. Defense counsel asked if Anaya was questioned about the murder, and Detective Hinson replied Anaya had already been eliminated as a suspect. When asked "[b]y limiting the focus of your investigation to only two people, you saw no need to interview Mr. Anaya or Mr. Birdsong or Mr. Campos any further after you spoke with Rito Maciel . . . isn't that true," Detective Hinson replied "I wasn't aware of those names specifically myself as being involved in this crime until Luis Perez-Correa brings that information in August" and "[b]y that time we had already been able to eliminate them as suspects." *Id*. at 39.

[8]     The State renewed its motion to admit a portion of the recorded conversation between Leal and Maciel to explain the reason certain people were eliminated as suspects. Garcia-Berrios argued he had not opened the door. The court stated the defense's theme had been "[t]hat all [these] people were involved in this thing" and "[s]o [Detective Hinson] should be able to say no, I didn't interview him because I have [] Leal on tape in front of [] Maciel saying that he and Angel were there." *Id*. at 46. Defense counsel noted Leal said "Angel," and the prosecutor indicated she could say that no last names were used. *Id*. The court did not admit the recording but allowed the prosecutor to ask Detective Hinson why he eliminated certain people as suspects.

[9]     On redirect examination of Detective Hinson, the State asked why Campos, Anaya, and Birdsong had been eliminated as suspects, and Detective Hinson testified: "I was in possession of recorded conversation between Rito Maciel and Rolando Leal in which Rolando Leal says that he and a person by the name of Angel were at the scene, at the Thaddeus Rodriguez' homicide." *Id*. at 57. The prosecutor asked "[w]as a last name given in that recording," and Detective Hinson answered "[n]o." *Id*.

[10]    The jury found Garcia-Berrios guilty of murder under Count I, battery by means of a deadly weapon as a level 5 felony under Count II, and criminal gang activity as a level 6 felony under Count III. The jury later found Garcia-Berrios guilty of the allegations in the criminal gang enhancement information. The court sentenced Garcia-Berrios to sixty years for murder under Count I and enhanced the sentence by sixty years. It sentenced him to three years under

Count II, concurrent with the sentence under Count I, and did not enter judgment on Count III.

## Discussion

### I.

[11] Garcia-Berrios first claims the trial court improperly admitted a portion of Detective Hinson's testimony. The trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). A trial court's ruling on the admission of evidence is generally accorded a great deal of deference on appeal. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015), *reh'g denied*. We do not reweigh the evidence; rather, we consider only evidence that is either favorable to the ruling or unrefuted and favorable to the defendant. *Beasley v. State*, 46 N.E.3d 1232, 1235 (Ind. 2016).

[12] Garcia-Berrios argues Detective Hinson's testimony regarding Leal's statement was inadmissible hearsay and was extremely prejudicial to him. He also argues he was denied his right of confrontation and, while he did not object on that basis below, the error was fundamental error. The State responds that Garcia-Berrios opened the door as part of his defense strategy and cannot show fundamental error.

[13] "Opening the door refers to the principle that where one party introduces evidence of a particular fact, the opposing party is entitled to introduce evidence in explanation or rebuttal thereof, even though the rebuttal evidence otherwise would have been inadmissible." *Wilder v. State*, 91 N.E.3d 1016, 1023 (Ind. Ct.

App. 2018) (quoting *Sampson v. State*, 38 N.E.3d 985, 992 n.4 (Ind. 2015)). Evidence which opens the door must leave the trier of fact with a false or misleading impression of the facts related. *Id.* When that happens, the State may introduce otherwise inadmissible evidence if it is a fair response to evidence elicited by the defendant. *Id.*

[14] The jury heard Perez-Correa's testimony that he had given law enforcement the names of Leal, Campos, Anaya, and Birdsong in connection with Rodriguez's murder and that he had obtained the information from Leal. Garcia-Berrios's counsel later asked Detective Hinson about why he saw no need to interview Anaya, Birdsong, and Campos, and Detective Hinson answered that they had been eliminated as suspects. Defense counsel's questioning could have left the jury with a false or misleading impression. The trial court did not admit the recording but permitted the prosecutor to ask a limited question so that Detective Hinson was able to explain why Anaya, Birdsong, and Campos were eliminated as suspects. The prosecutor's question on redirect examination and Detective Hinson's reply was a fair response to testimony elicited by Garcia-Berrios's counsel. Based upon the record, we cannot say the trial court abused its discretion in admitting the challenged portion of Detective Hinson's testimony. *See Wilder*, 91 N.E.3d at 1023 (holding the defendant opened the door to a detective's testimony when he attacked the police investigation and the State was entitled to elicit testimony about why it brought charges without first interviewing certain persons).

To the extent Garcia-Berrios refers to his right to confrontation and asserts fundamental error, we note the fundamental error exception is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. *Halliburton v. State*, 1 N.E.3d 670, 678 (Ind. 2013). The error must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process. *Id*. This exception is available only in egregious circumstances. *Id*. *See Durden v. State*, 99 N.E.3d 645, 652 (Ind. 2018) ("[I]f the judge could recognize a viable reason why an effective attorney might not object, the error is not blatant enough to constitute fundamental error."). Defense counsel opened the door to the challenged portion of Detective Hinson's testimony. The trial court could recognize a viable reason why Garcia-Berrios's defense counsel wished to question Detective Hinson about eliminating other suspects even if the questioning opened the door to the challenged portion of his testimony. In light of all the evidence before the jury as set forth in the record, the admission of the limited testimony of Detective Hinson on redirect examination did not make a fair trial impossible or result in fundamental error.

## II.

Garcia-Berrios next claims the evidence is insufficient to support the criminal gang enhancement. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. Rather, we look to the evidence

and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.* We apply the same standard when reviewing the sufficiency of the evidence for a sentencing enhancement. *See Woods v. State*, 939 N.E.2d 676, 677 (Ind. Ct. App. 2010), *trans. denied*.

[17] Garcia-Berrios argues there is insufficient evidence to show he was a member of a criminal gang as defined by statute. He also asserts the enhancement statute violates Article 1, Section 16 of the Indiana Constitution. The State responds the testimony of Perez-Correa, Maciel, Special Agent Jason Gore, and Detective Hinson support the enhancement.

[18] At the time of the offense, Ind. Code § 35-50-2-15(d) provided that, if the jury "finds that the state has proved beyond a reasonable doubt that the person knowingly or intentionally was a member of a criminal gang while committing the felony offense and committed the felony offense at the direction of or in affiliation with a criminal gang," the court shall sentence the person to an additional fixed term of imprisonment equal to the sentence imposed for the underlying felony, if the person is sentenced for only one felony, or an additional fixed term of imprisonment equal to the longest sentence imposed for the underlying felonies, if the person is being sentenced for more than one felony. (Subsequently amended by Pub. L. No. 25-2016, § 29 (eff. July 1, 2016)). A "criminal gang" was defined as a group with at least three members that "(1) either: (A) promotes, sponsors, or assists in; or (B) participates in; or

(2) requires as a condition of membership or continued membership; the commission of a felony . . . or the offense of battery . . . ." Ind. Code § 35-50-2-1.4 (subsequently amended by Pub. L. No. 25-2016, § 27 (eff. July 1, 2016)).

[19] To the extent Garcia-Berrios argues Ind. Code § 35-50-2-15 violates Article 1, Section 16 of the Indiana Constitution, which provides "[a]ll penalties shall be proportioned to the nature of the offense," this Court observed in *Armstrong v. State* that the provision is violated only when the criminal penalty is not graduated and proportioned to the nature of the offense. 22 N.E.3d 629, 638 (Ind. Ct. App. 2014), *trans. denied*. Given the enhancement under Ind. Code § 35-50-2-15 is graduated and proportioned to the nature of the offense, and in light of the circumstances surrounding the murder of Rodriguez in this case, we cannot say the enhancement violates Article 1, Section 16. *See id*. at 639 (holding, given the enhancement in Ind. Code § 35-50-2-15 is graduated and proportioned to the nature of the offense and the circumstances surrounding the murder, the enhancement did not violate Article 1, Section 16).

[20] Perez-Correa testified there were multiple criminal gangs in East Chicago which originated in Chicago, the gangs in East Chicago do not function with the same level of loyalty as those in Chicago, there were "Renegade" factions of the gangs which did not always follow the rules of their organizations, and Renegade Two Six and Renegade Imperial Gangsters were in East Chicago in 2016. Transcript Volume V at 2. He testified he lived in an Imperial Gangsters' neighborhood, members of Two Six frequented his house, his stepdaughter was involved with Renegade Two Six member Richie Campos, and Garcia-Berrios

had visited his house when other Two Six members were present. He indicated that, based on his interactions with Garcia-Berrios, he believed Garcia-Berrios was a member of Two Six. He testified Dequan Birdsong was a Renegade Gangster Disciple, Josue Anaya was a Renegade Two Six, and Leal was a Renegade Imperial Gangster.

[21] Perez-Correa further testified Rodriguez was not in good standing with Two Six and had a reputation for being a thief. He indicated members of traditionally opposing gangs would sometimes come together if they were Renegades, which was called "cliqued up." *Id*. at 13. He indicated that, in gang culture, if a member of a gang had a beef with an individual and it affected the gang, generally the other members would also have a beef with the individual. He testified that, if someone did something to him or his family, he would be required to respond in some manner because "you're not supposed to let anybody know you're a punk" or "[a] lame, like you can't handle no business." *Id*. at 14. He indicated the retaliation could range from "a beat down" to being "[g]unned down." *Id*. In addition, he testified that Leal, Campos, Anaya, and Birdsong were Renegades and also members of Leal's "EBK" crew, which stood for "Everybody killer." *Id*. at 16-17.

[22] Maciel testified he was a member of Two Six for about ten years including in January 2016. He testified the Indiana faction of the gang was called a Renegade faction and had the "[s]ame colors [and] basic symbols" as its parent organization in Chicago. *Id*. at 118. He testified that Two Six and the Imperial Gangsters were traditionally in opposition to each other but that, in Northwest

Indiana, it was different and "[t]hey just pick and choose who they want to . . . have any type of relationship with." *Id.* at 120. He indicated that, in January 2016, there was "cliquing up going on between the Renegade IGs and the Renegade Two Sixes." *Id.* He testified that Rodriguez was a member of Renegade Two Six and Leal was a Renegade Imperial Gangster. Maciel testified he met Garcia-Berrios on the night of the murder, he knew Garcia-Berrios had two brothers who were members of Two Six, and Garcia-Berrios greeted him using a handshake which was "a greeting amongst your fellow gang members." *Id.* at 127. He demonstrated the handshake for the jury and testified "[i]t's just a symbol like of the bunny ears, and the symbol of Two Six is the bunny, Playboy bunny, and with the right ear bent." *Id.* at 127-128. He testified the handshake was an indication of gang membership. When asked what gang he knew Garcia-Berrios to be from, Maciel answered Two Six.

[23] Maciel further testified he spoke with Garcia-Berrios sometime after the murder and Garcia-Berrios used the phrase "on the bunny," and when asked what the phrase meant, he testified "[t]hat's almost like a statement being made on behalf of the gang," "so on saying, 'on the bunny,' means like on the symbol of our gang," "[s]o that's kind of solidifying like this is what this is on, just kind of basing a truth -- something truthful," and "putting it 'on the bunny' means almost like, you know, putting your right hand on the Bible type of thing, but which is the wrong way." *Id.* at 146-147. In addition, when asked if Rodriguez "had been green-lighted, meaning a 'shoot-on-sight order' . . . since 2012," Maciel replied "I knew he was in bad terms with the gang, and that's what they

kind of phrased it as, I guess," and he confirmed "SOS" meant "Shoot on sight" and to "green light" meant "giving other members the okay to go ahead and take someone's life." *Id*. at 173-174. He indicated he believed Garcia-Berrios murdered Rodriguez because he had stolen from his sister and, when asked if there were other reasons, replied "[l]ots of them" such as "[s]tanding amongst other people" and "peer pressures." *Id*. at 178.

[24] Special Agent Jason Gore with the Bureau of Alcohol, Tobacco, Firearms, and Explosives testified he had been investigating street gangs in Northwest Indiana since 2010 and there were three or more members in each of Two Six, Renegade Two Six, and Renegade Imperial Gangsters. He testified Garcia-Berrios was a member of Two Six, Garcia-Berrios's brother, half-brother, and stepfather were also members of Two Six, the street gangs are highly structured, and "in a lot of these street gangs you find father-son, uncle-nephew, brothers. It's very generational." *Id*. at 213. He testified that problem gang members could be sanctioned financially, beaten, or killed depending on the violation. He testified Rodriguez was a member of Two Six, a problem member, and "a thief. He stole a lot, and he stole from members, and that was a real problem." *Id*. at 214.

[25] Detective Hinson testified Garcia-Berrios was a Renegade Two Six and Leal was a Renegade Imperial Gangster. He testified it was common for the Renegade sections of these gangs to intermingle and "clique up" together and Rodriguez was a problem for his gang. Transcript Volume VI at 24. He testified that a person's status in a gang was correlated to how the person

protected his name, the gang culture revolves around violence and respect, the purpose of the gang is to have support from others, and "if you're part of the same gang, or say, for instance, part of the same clique, who's linked up, your problems become their problems, their problems become your problems. You're working together. You're a gang." *Id.* at 27.

Based upon the record, we conclude the State presented sufficient probative evidence that Garcia-Berrios was a member of a criminal gang while committing the offenses and committed the felony offenses in affiliation with a criminal gang.

For the foregoing reasons, we affirm Garcia-Berrios's convictions and criminal gang enhancement.

Affirmed.

Najam, J., and Kirsch, J., concur.