## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 08 2016, 5:36 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Brandon E. Murphy<br>Delaware County Public<br>Defender's Office<br>Muncie, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana<br><br>Ian McLean<br>Deputy Attorney General<br>Indianapolis, Indiana |

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lionel R. Mackey, Jr.,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 8, 2016<br><br>Court of Appeals Case No.<br>18A02-1506-CR-673<br><br>Appeal from the Delaware Circuit Court<br><br>The Honorable Linda Ralu Wolf, Judge<br><br>Trial Court Cause No.<br>18C03-1304-FC-10 |

**Mathias, Judge.**

[1]     Lionel R. Mackey, Jr., ("Mackey") was convicted in Delaware Circuit Court of Class C felony stalking, Class A misdemeanor invasion of privacy, and Class B

misdemeanor harassment. Mackey appeals and presents four issues, which we restate as:

I. Whether the trial court abused its discretion in admitting evidence regarding messages the defendant received from an instant messaging account;

II. Whether the trial court abused its discretion in admitting into evidence out-of-court statements made by Mackey's ex-wife;

III. Whether the trial court abused its discretion in admitting evidence regarding an incident in which a tire on the car driven by the victim was slashed; and

IV. Whether Mackey's convictions for stalking, invasion of privacy, and harassment constitute double jeopardy.

Concluding that the trial court made no reversible evidentiary error but that Mackey's conviction for harassment does constitute double jeopardy, we affirm his convictions for stalking and invasion of privacy, reverse his conviction for harassment, and remand with instructions to vacate the conviction and sentence entered thereon.

## Facts and Procedural History

At the time relevant to this appeal, Mackey was living with his then-girlfriend, J.H., and her two children, E.H. and K.H., in Mackey's mobile home in Delaware County. The couple had lived together for about eighteen months and had discussed marriage. E.H. treated Mackey as her father and even called him "daddy." Tr. p. 33. In early March 2013, Mackey picked J.H. up from work and informed her that another woman, J.S., and her two children were going to move into Mackey's home, too. Mackey told J.H. that he wanted J.H.

to become familiar with J.S. so that they could become "like sister wives." Tr. p. 35. Although J.H. did not agree with this idea, J.S. and her children stayed at Mackey's home that weekend.

[4] That Monday, March 11, 2013, Mackey and J.H. argued. As a result, Mackey refused to take J.H. to work or her children to school. Mackey told J.H. later that day that he was going to change the locks on the mobile home and that she should retrieve her belongings. After taking her children to her mother's house, J.H. went to the mobile home with several of her relatives to obtain her belongings. Concerned that Mackey might prevent her from taking her property, J.H. telephoned the Sheriff's Department and asked for a deputy to be present when she retrieved her property.

As J.H. retrieved her property, she and Mackey exchanged text messages on their phones. In these messages, Mackey repeatedly insulted J.H. using extremely vulgar language. When J.H. told Mackey that she would not be there until 4:30 p.m., he responded, "then ill start trowing s**t out now." Ex. Vol. p. 4.[1] He also told her, "U better come get ur s**t cause u rnt stayin here anymore. . . . Cause im changeing the locks today." *Id*. at 5. When J.H. sent a message stating, "I will be homeless I will have no place to go," Mackey replied, "Ur fault." *Id*. Mackey also demanded money that he thought was in J.H.'s possession and told her, "an if I don't get it before 1015 im f**kin smashin s**t

---

[1] The text messages contain numerous abbreviations and misspellings. We present the content of the messages as they were transcribed and submitted into evidence.

and tossin it out the f**kin door." *Id*. When J.H. asked if she could keep the washer and dryer, Mackey responded, "f**k u im trow the sit out now since u 2want to play games im f**kin done wi5th ur s**t." *Id*. at 6.

The text message conversation continued:

[J.H.]: will u let me have my washer and dryer and tv and I will give u the jeep with its title

[Mackey]: F**k u no washer and dryer ur leaven out of state[2] any ways al least u better

[J.H.]: U want the jeep and your money and s**t then give me tv and washer and dryer then forget it

[Mackey]: Yea an f**k ur weddin s**t and daddys tools an I will get my money if I got to take it out of ur carf I will tonight

[J.H.]: Washer and dryer and tv too then u can have all your s**t

[Mackey]: no ill take it out tonight just watch

[Mackey]: No but I want my money tonight an my blanket

[Mackey]: Alright u asked for it u want it like this hope u can deall with the price

[Mackey]: Found ur purfume c**t to bad

[Mackey]: New u were a c**t like my ex wife she would have done the same an did with my money

[Mackey]: No man will love u or ur lose worn out p***y

[Mackey]: F**k u c**t

[Mackey]: Lien ass c**t is what u r

---

[2] J.H. had told Mackey that she planned to move out of Indiana.

| | |
|---|---|
| [J.H.]: | I have your stuff and your money. I want my stuff and dads tools |
| [Mackey]: | Were |
| [J.H.]: | Here at the hotel. I told u I wont go back to mom and dads |
| [Mackey]: | I don't have it f**kin now do I dumb ass |
| [J.H.]: | U will as soon as u have mikemckane25 send me threats. Then u will get your s**t even ur jeep |

*Id.* at 6-7.

The text messages between the two continued the next day. J.H. told Mackey that he could have the Jeep in the following exchange:

| | |
|---|---|
| [J.H.]: | I wil give u all ur s**t jeep is all moms. Keys r in it go get it. I put gas in it. U will have the rest of ur s**t and money tomorrow as soon as I take my kids to school thanks for breaking [E.H.]'s heart |
| [Mackey]: | Whatevr I sure cant go get it no2w can I an I want my money tonight |
| [Mackey]: | U r a c**t how am I supost to f**kin get anything u dumbasss b**ch |
| [Mackey]: | I want my money now so I can f**kin get smokes u b**ch |
| [Mackey]: | Ur a f**kin lier so I know the jeep isn't there an ur not given my s**t back u r just a lien c**t |

*Id.* at 7. J.H. again told Mackey that she would return his belongings, which only elicited more profanity from Mackey. Mackey even threatened to let E.H.'s father know that J.H. was homeless and to call child protective services and "tell them what a worthless mother u r to ur kids." *Id.* at 8. J.H., obviously

angered, told Mackey, "I do have other stuff there but u and it can go to hell I burtn ur blankets and I spent ur money go f**k off bastard." *Id.* at 9. Mackey then threatened to destroy J.H.'s car, writing, "Fine kiss ur car good bye," and "Try driven in a smashed up peice of s**t now c**t." *Id.* Mackey then told J.H. that he had found a photo album containing pictures of J.H.'s child who died in infancy, cruelly taunting her by stating, "Oh and by the way I have ur dead babys pictures to bad for u c**t." *Id.*

[6] A text message conversation of a similar tenor took place again the next day. Mackey told J.H. not to call him while blocking her number from caller ID, then stated, "I don't care anymore I don't want to talk to ur kids so go to hell an die." *Id.* at 10. J.H. told Mackey, "I want my stuff and don't want trouble. Or beat up or killed by u. I will leave u alone just want my stuff." *Id.* Mackey replied, "Don't care u rnt getting s**t u told cops u got it all ur f**k up an u took my s**t u f**kin lien theif." *Id.* Mackey also stated that he had thrown anything left by J.H. at the mobile home in the trash. He then told J.H., "Just go to Oklahoma b**ch an I don't care about court u cant prove s**t stupid." *Id.* Ironically, he warned her not to text or call him anymore or he would "get [her] for harassment." *Id.*

[7] Despite warning J.H. not to contact him, Mackey texted her the following day, insinuating that he had tampered with the brakes on her car, stating, "to not stop when I needs to that would hurt," and "have fun stopping." *Id.* He also accused J.H. of slashing the tires on his car. J.H. did not respond to these text messages.

[8] On March 15, 2013, J.H. obtained a protective order against Mackey that enjoined him from threatening or committing acts of domestic or family violence, stalking, or a sex offense against J.H. At 6:00 p.m. that same day, the Delaware County Sheriff's Department personally served the protective order on Mackey.

[9] Undeterred by the protective order, Mackey texted J.H. again on March 18, 2013. In addition to the arguments regarding property and money, Mackey threatened to kill himself. Specifically, when J.H. told Mackey, "I hope u find happiness," he replied, "I never will till im dead." *Id*. at 12. J.H. responded, "Please don't talk like that. You know I always got scared had nightmares when u talked that way." *Id*. She then sent a photo of Mackey with E.H., and repeated that him talking about his death worried her. Mackey then stated, "Like I said goodbye forever u got ur freedom an I get my death." *Id*. He then began to tell J.H. "goodbye forever." *Id*. The next day, he texted her a picture of a bottle of liquor and pills, calling it his "death cocktail." *Id*. at 14.

[10] On March 22, 2013, Mackey again texted J.H. Among the messages he sent to J.H. was one where he stated, "Remember how my ex wife got her s\*\*t back when she pissed me off keep playing around an ull get ur s\*\*t in peices an burned what ever u left cause I don't need or want it im done with your kids games." *Id*. at 14.

[11] In addition to the text messages, Mackey also called J.H.'s phone using a blocked number, but J.H. recognized the voice as Mackey's. On March 26,

2013, Mackey called J.H. and told her that he would "blow up" the place where she was living. Tr. pp. 60-61.

[12] On March 27, 2013, one of J.H.'s coworkers was in the employee's parking lot eating lunch in her car. As she did so, she saw a man in a heavy-duty working jacket and wearing sunglasses and a cap on his head. This man went straight to the car J.H. was driving, which belonged to her mother, and slashed a tire on the car. Later that day, J.H. received a telephone call from a payphone at a convenience store where Mackey often stopped while delivering newspapers. Mackey told J.H. that he wanted "his daughter" back, which she understood to mean E.H., and he stated "next time it's going to be you." Tr. pp. 69-70.

[13] After she moved out of Mackey's mobile home, J.H. began to receive instant messages in addition to the text messages from Mackey's cell phone. These instant messages were from an account with a user name of "mikemckane25." Tr. p. 75. These messages generally threatened J.H.'s life. For example, one message sent on March 14, 2013, stated, "u r goin to die u f**ked up real bad no joke." Ex. Vol., State's Ex. 9. Another message sent the next day stated, "death to all whores an fat c**ts like you may ur family rest in peices." *Id.*, State's Ex. 10.

[14] On March 28, 2013, J.H. received a telephone call from Mackey. J.H.'s cousin answered the phone, pretending to be J.H.'s new boyfriend. Shortly thereafter, J.H. received another instant messages from "mikemckane25" stating, "ur retard cousin just f**ked ur case b**ch cause ur s**t is gettin thrown out ur goin

to lose stupid . . . an u will be seeininside of jail for uies a false reporting." *Id*., State's Ex. 7-8.

[15] J.H. eventually reported Mackey's actions to the police. Detective Kyle Monroe ("Detective Monroe") of the Muncie Police Department interviewed Mackey on March 29, 2013. During the interview, Detective Monroe asked Mackey about the instant messages J.H. had received. Instead of mentioning the user name "mikemckane25" to Mackey, Detective Monroe deliberately referred to the user name as "MikeyMcKay," to "see if [he]'d be corrected or not." Tr. pp. 185-86. Mackey corrected the detective and told him the name was "mikemckane25." *Id*. at 186. After this interview, another message sent from mikemckane25 on April 1, 2013, stated, "im goin to killl u whore just wait u will die." Ex .Vol., State's Ex. 11.

[16] On April 18, 2013, the State charged Mackey as follows: Count I, Class C felony stalking; Count II, Class D felony stalking; Count III, Class D felony intimidation; Count IV, Class D felony intimidation; Count V, Class D felony intimidation; Count VI, Class A misdemeanor invasion of privacy; Count VII, Class A misdemeanor invasion of privacy; and Count VIII, Class B misdemeanor harassment. A plea hearing was held on June 10, 2013, at which Mackey agreed to plead guilty. However, Mackey later moved to withdraw his guilty plea, and the trial court granted this motion. After numerous *pro se* motions and the appearance and withdrawal of several defense attorneys, a jury trial commenced on January 28, 2015.

At trial, the court admitted evidence regarding the instant messages J.H. had received from "mikemckane25," over the objection of Mackey's counsel. The trial court also permitted J.H. to testify, over Mackey's objection, that she had learned about "mikemckane25" from Mackey's ex-wife, who "was receiving the same stuff when they broke up." Tr. pp. 121-22. The trial court also permitted the State to call as a witness J.H.'s coworker who saw a man slash the tires on the car driven by J.H. At the conclusion of the trial, the jury found Mackey guilty on Counts I, II, VI, and VIII, but not guilty on the remaining counts.

At the sentencing hearing held on May 21, 2015, Mackey requested that the trial court vacate the convictions on Counts II, VI, and VIII, based on double jeopardy concerns. The trial court "merged" Counts I and II, but declined to vacate or merge Counts VI and VIII. The court then sentenced Mackey on Count I to eight years, with seven years executed and one suspended to probation. The trial court imposed sentences of one year on Count VI and six months on Count VIII, to be served concurrently with each other and Count I. Thus, Mackey received an aggregate sentence of eight years. Mackey now appeals.

## I. Admission of Instant Messages

Mackey first claims that the trial court abused its discretion in admitting evidence regarding the instant messages J.H. received from "mikemckane25." Mackey claims that these messages were not properly authenticated and should not have been admitted.

We first note that questions regarding the admission of evidence are within the sound discretion of the trial court, and we review the court's decision only for an abuse of that discretion. *Wells v. State*, 904 N.E.2d 265, 269 (Ind. Ct. App. 2009), *trans. denied*. A trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. *Id*.

To lay a foundation for the admission of evidence, the proponent of the evidence must show that it has been authenticated. *Pavlovich v. State,* 6 N.E.3d 969, 976 (Ind. Ct. App. 2014), *trans. denied.* This authentication requirement applies to the substantive content of instant messages purported to be sent by a party. *See id*. (noting that Evidence Rule 901 applies to text messages purportedly sent by a party). Under Indiana Evidence Rule 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."[3] Absolute proof of authenticity is not required; instead, the proponent of the evidence need establish only a reasonable probability that the document is what it is claimed to be. *Pavolvich,* 6 N.E.3d at 976. Once this reasonable probability is shown, any inconclusiveness regarding

---

[3] As noted in *Pavlovich*, the Indiana Rules of Evidence were amended effective January 1, 2014, to grammatically reword many of the rules. *Pavlovich*, 6 N.E.3d 969, 976 n.4. The amendments, however, did not alter the substance of Evidence Rule 901(a), which, prior to the amendments, provided that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *See also Pavlovich*, 6 N.E.3d 976 n.4 (noting that 2014 amendments did not alter the substance of Evidence Rule 901(a)).

the exhibit's connection with the events at issue goes to the exhibit's evidentiary weight, not its admissibility. *Id.* Authentication of an exhibit can be established by either direct or circumstantial evidence. *Id.*

[22] Here, the State provided sufficient evidence to establish a reasonable probability that the messages from mikemckane25 were sent by Mackey or at his direction. First, J.H. stated she recognized the messages as being from Mackey based on the similarity in spelling and tone. Also, the messages from mikemckane25 began when Mackey told J.H. to move out of the mobile home and stopped after Mackey was arrested. Furthermore, when Mackey telephoned J.H. and her cousin answered, pretending to be her new boyfriend, J.H. received a message from mikemckane25 referencing her cousin. This strongly suggests that Mackey was responding to J.H.'s cousin answering the call via an instant message sent from the mikemckane25 account. When Detective Monroe intentionally misspoke the name of the instant messaging account, Mackey corrected him. All of this supports a finding of a reasonable probability that the instant messages received by J.H. from mikemckane25 were indeed from Mackey as alleged by the State.[4] The trial court did not abuse its discretion in admitting these messages over Mackey's authentication objection. *See People v. Downin*, 828 N.E .2d 341, 350-51 (Ill. App. Ct. 2005) (holding emails were adequately authenticated as being written by defendant where victim personally

---

[4] We make this conclusion without reference to J.H.'s testimony that Mackey's ex-wife received similar messages from mikemckane25 after her relationship with Mackey ended.

knew defendant, had communicated previously with defendant through email, defendant was responsive to victim's email message, and email contained information that would have been known exclusively to him).

## II. Admission of Mackey's Ex-Wife's Out-of-Court Statements

Mackey also claims that the trial court abused its discretion when it permitted J.H. to testify regarding certain statements made by Mackey's ex-wife. During Mackey's cross-examination of J.H., defense counsel attempted to impeach J.H. with regard to the messages she received from mikemckane25. Specifically, defense counsel inquired as to why J.H. mentioned mikemckane25 in her text messages to Mackey on March 11, 2013, which was before she testified to have received the first message from that account. The relevant portion of the cross-examination provides:

> Q. Now, March the 11th was the day that the two of you split up and the fight started, is that correct?
>
> A. Yes sir.
>
> Q. Okay. Had you gotten any Mikemckane25 messages that day?
>
> A. No sir.
>
> Q. Then how can you explain the last transcript on March the 11th, the next thing down on this transcript is March the 12th, so this is the last one on March 11th. . . .
>
> * * *
>
> Q. So you knew who mikemckane25 was as of March the 11th?
>
> A. I didn't know who that was, I assumed that it was coming from Mr. Mackey. I don't remember exact dates sir.

Q.   Well, do you doubt that this Exhibit 3, and it's a transcript of your conversations, text messages with him. Somehow, you knew about this Mike McKane even the day you split up, is that correct?

A.   Sir, could you please repeat that, I don't quite understand what you are asking.

Q.   Well, you think that mikemckane25 is Lionel Mackey?

A.   Yes sir[.]

Q.   But you knew about mikemckane25 as of March 11th, the day you split up? Is that correct? This would indicate it?

A.   Yes sir.

Q.   How did you know that mikemckane25 was going to send you threats?

A.   *Because of his ex-wife. He sent them to her.*

Q.   *Well, you don't know that except what she told you, do you?*

A.   *I don't know personally except when we had talked, yes, that's it.*

Q.   So you knew something about this mikemckane25 long before, or several days before you started getting these threats?

A.   Not several days. I knew at that time after I had spoken to her.

Q.   Well, this exhibit, whichever one it is, you are going to die, you f\*\*ked up real bad, no joke. That's March the 14th, is that correct?

A.   Yes sir.

Q.   And you don't know what the numbers at the top of these messages are, 924-665-01, you don't know what those are?

A.   No sir, I do not.

Q.   Did you ever make any effort to trace those numbers, whatever they are, or mikemckane25?

A.   No sir. I never traced them.

Q. Did you ask the police to?

A. I gave them my phone and showed them the threats I was receiving sir. I didn't trace any numbers.

Tr. pp. 90-94 (emphasis added).

[24] On re-direct examination, the State sought to explore this topic further:

Q. . . . Um, Mr. Wilson tried to ask you why you knew on March 11th about Mike McKane. You testified that you had spoken to the defendant's ex-wife, is that correct?

A. Yes ma'am.

Q. And from that conversation did you learn about Mike McKane[?]

A. I learned about Mike McKane from her yes ma'am. But she was receiving the same stuff when they broke up.

Tr. pp. 121-22. At this point, Mackey objected, claiming that the testimony was hearsay. The State claimed that Mackey had opened the door to this line of questioning on cross-examination, and the trial court overruled Mackey's objection. The State's questioning then continued:

Q. You had a conversation, what date was that, with his ex-wife?

A. It was around the same time. She was giving me information where he had stalked her. Did the same thing to her. Text messaged her.

*Id.* at 122. Mackey again repeated his objection, and the trial court again overruled it, and the questioning continued:

Q. Specifically, after talking with his ex-wife, what's her name?

A. [D].

Q. And where does she live?

A. Portland, Oregon.

Q. Through talking with [D.], did you learn that she had received messages about Mike McKane?

A: Yes ma'am, I did.

\* \* \*

Q. And when you started receiving messages from Mike McKane, what went through your mind?

A. It was Lionel.

\* \* \*

Q. In addition to what his ex-wife had told you about Mike McKane, were there other reasons you believed Mike McKane was Lionel?

A. Same spellings, same references.

Tr. pp. 123-24.

[25] On appeal, Mackey claims that J.H.'s testimony regarding what Mackey's ex-wife told her was inadmissible hearsay.[5] Hearsay is defined by Indiana Evidence Rule 801(c) as a statement that (1) "is not made by the declarant

---

[5] Mackey also claims that the admission of his ex-wife's out-of-court statements violated his right to confront witnesses protected by the Sixth Amendment to the United States Constitution. At trial, however, Mackey objected to this testimony only on grounds that it was hearsay and referred to "offenses not charged." Tr. p. 122. This is insufficient to preserve an argument based on the Confrontation Clause. *See Boatner v. State*, 934 N.E.2d 184, 187-88 (Ind. Ct. App. 2010) (holding that defendant's hearsay objection was insufficient to preserve Confrontation Clause issue on appeal); *Armstrong v. State*, 22 N.E.3d 629, 640 (Ind. Ct. App. 2014) (same), *trans. denied*.

while testifying at the trial or hearing" and "(2) is offered in evidence to prove the truth of the matter asserted." Hearsay, as a general rule, is inadmissible. Ind. Evidence Rule 802.

[26] The State makes no claim that the testimony at issue was not hearsay or was admissible under an exception to the hearsay rule. Instead, the State argues that Mackey opened the door to such testimony upon his cross-examination of J.H. What might otherwise be inadmissible hearsay evidence may become admissible where the defendant "opens the door" to questioning on that evidence. *Turner v. State*, 953 N.E.2d 1039, 1055 (Ind. 2011). "Opening the door refers to the principle that where one party introduces evidence of a particular fact, the opposing party is entitled to introduce evidence in explanation or rebuttal thereof, even though the rebuttal evidence otherwise would have been inadmissible." *Sampson v. State*, 38 N.E.3d 985, 992 n.4 (Ind. 2015).

[27] We agree with the State that Mackey's questioning of J.H. opened the door to this evidence. Mackey's questions left the jury with the impression that J.H. might have concocted the mikemckane25 account herself by noting that she mentioned the account name even before claiming to have received a message from the account. Also, J.H.'s first mention of Mackey's ex-wife and her knowledge of the mikemckane25 account was in direct response to a question asked by Mackey's counsel. The State's questions did little more than repeat the information elicited by Mackey's own counsel—that Mackey's ex-wife had received similar messages from Mackey when their relationship ended. Under these facts and circumstances, we cannot say that the trial court abused its

discretion in concluding that Mackey had opened the door to this line of questioning.

[28] Moreover, even if we did believe that the trial court had abused its discretion, we would not reverse Mackey's convictions. Errors in the admission of evidence are to be disregarded as harmless unless they affect the substantial rights of a party. *Turner*, 953 N.E.2d at 1058-59. When assessing the effect of an evidentiary ruling on a defendant's substantial rights, we look to the probable impact on the trier of fact. *Id* at 1059. The improper admission of evidence will be deemed harmless error if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court there is no substantial likelihood the challenged evidence contributed to the conviction. *Id*.

[29] Here, the testimony regarding Mackey's ex-wife's statements was not particularly lengthy. As discussed above, the authenticity of the messages J.H. received from mikemckane25 was established through other evidence. Moreover, as noted above, the State's questions to J.H. regarding Mackey's ex-wife's statements essentially repeated what Mackey's own counsel elicited during his questioning of J.H. Such cumulative evidence is harmless. *Hoglund v. State*, 962 N.E.2d 1230, 1238 (Ind. 2012) (noting that any error in the admission of evidence is not prejudicial, and is therefore harmless, if the same or similar evidence has been admitted without objection); *Robey v. State*, 7 N.E.3d 371, 381 (Ind. Ct. App. 2014) (noting that error in the admission of evidence is harmless if the erroneously-admitted evidence is cumulative of other evidence appropriately admitted), *trans. denied*. Under these facts and circumstances, we

cannot say that the admission of this evidence affected Mackey's substantial rights.

### III. Admission of Evidence Regarding Tire Slashing

[30] Mackey next argues that the trial court abused its discretion when it admitted evidence regarding an incident in which a man slashed the tire of the car J.H. had driven to work, the obvious implication being that this man was Mackey himself or acting at Mackey's behest. On appeal, Mackey claims that this evidence should have been excluded "Indiana Rules of Evidence 401, 403, 404 and/or for having an insufficient foundation." Appellant's Br. p. 19. At trial, however, Mackey objected as follows:

> I would object to this testimony Your Honor. [T]his has already been touched on by the previous witness about a tire slashing. But this witness stated in the deposition she cannot identify the [culprit]. I think this is prejudicial to us because we don't know who slashed the tire. And I don't think she can even describe him very well except for clothing.

Tr. pp. 134-35. From this, it appears that Mackey's trial objection was based on the relevance of the evidence, and he cannot present, for the first time on appeal, new arguments for why the evidence should not be admitted. *Armstrong v. State*, 22 N.E.3d 629, 640 (Ind. Ct. App. 2014) (a party may not object to the admission of evidence on one ground at trial and seek reversal on appeal based on a different ground), *trans. denied*.

Furthermore, as Mackey's counsel noted in his objection, this incident had already been described in testimony previously admitted without objection. Specifically, J.H. testified that she was at work when she was informed that a tire on the car she had driven to work had been slashed. Later that day, she received a phone call from Mackey stating that he wanted "his daughter" back and threatened J.H. by stating, "next time it's going to be you." Tr. p. 70. On cross-examination, Mackey's counsel explored this tire-slashing incident, attempting to elicit testimony that the man who slashed the tires was not identified:

> Q. Now, who was it that told you that [Mackey], I think this is what you were told, had slashed your tire on the 27th?
>
> A. A fellow employee at work had seen my tires be slashed.
>
> Q. Incidentally, how many tires were slashed?
>
> A. Just one (1).
>
> Q. One (1). Um, did this fellow employee tell you that it was [Mackey]?
>
> A. No she did not.
>
> Q. All right. She just said someone?
>
> A. She said someone and she gave me a description.
>
> Q. A description of the person?
>
> A. Of the person who had slashed the tires.
>
> Q. And where did she get that description?
>
> A. She was sitting in her vehicle on lunch and she watched the person slash my tire.
>
> Q. And that was [A.D.]?
>
> A. Yes sir.

Q.      Are you aware [A.D] can't identify that person?

A.      [N]o sir, I am not aware of that.

Tr. pp. 95-96.

[32]    In rebuttal, the State called as witnesses both A.D., who witnessed the tire slashing, and the police officer who responded to the call of the vandalized car. Mackey objected to the testimony of these witnesses, as noted above. However, the substance of their testimony—that a man slashed a tire on the car that J.H. had driven to work—had already been admitted without objection. Again, any error in the admission of evidence is not prejudicial, and is therefore harmless, if the same or similar evidence has been admitted without objection. *Hoglund,* 962 N.E.2d at 1238; *Robey*, 7 N.E.3d at 381.

## IV.  Double Jeopardy

[33]    Lastly, Mackey claims that his convictions for Class C felony stalking and both Class A misdemeanor invasion of privacy and Class B misdemeanor harassment constitute double jeopardy.

[34]    The Double Jeopardy Clause found in Article 1, Section 14 of the Indiana Constitution provides, "No person shall be put in jeopardy twice for the same offense." A trial court's legal conclusion regarding whether convictions and sentences violate double jeopardy principles is reviewed *de novo. Sloan v. State*, 947 N.E.2d 917, 920 (Ind. 2011). We analyze alleged violations of Indiana's Double Jeopardy Clause pursuant to our supreme court's opinion in *Richardson v. State*, 717 N.E.2d 32 (Ind. 1999). In *Richardson*, our supreme court held that

"two or more offenses are the 'same offense' in violation of Article 1, Section 14 of the Indiana Constitution, if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson,* 717 N.E.2d at 49 (emphasis in original).

[35] Under the "actual evidence" test, a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish all of the essential elements of a second challenged offense. *Hines v. State*, 30 N.E.3d 1216, 1222 (Ind. 2015) (citing *Richardson*, 717 N.E.2d at 53). But the fact that the same evidence may have been used to establish a single element of each of two offenses does not constitute a double jeopardy violation. *Id.* (citing *Spivey v. State*, 761 N.E.2d 831, 833 (Ind. 2002)).

[36] Application of this test requires the court to identify the essential elements of each of the challenged crimes and to evaluate the evidence from the jury's perspective. *Lee v. State*, 892 N.E.2d 1231, 1234 (Ind. 2008) (quoting *Spivey*, 761 N.E.2d at 832). On appeal, we therefore consider the essential elements of the offenses, the charging information, the jury instructions, the evidence, and the arguments of counsel. *Id*. The term "reasonable possibility" "turns on a practical assessment of whether the jury may have latched on to exactly the same facts for both convictions." *Id*. at 1236.

[37] Here, Mackey first claims that his conviction for Class C felony stalking and Class A misdemeanor invasion of privacy constitute double jeopardy under the actual evidence test. We disagree.

[38] To convict Mackey of Class C felony stalking, the State was required to prove that he stalked J.H. and made an implicit or explicit threat with the intent to place J.H. in reasonable fear of serious bodily injury or death. Appellant's App. p. 31; Ind. Code § 35-45-10-5(b)(1)(B). "Stalk" is defined by statute as meaning "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened."[6] Ind. Code § 35-45-10-1. Also, to convict Mackey of Class A misdemeanor invasion of privacy, the State was required to prove that he knowingly violated a protective order to prevent domestic or family violence issued to protect J.H. Appellant's App. p. 36; Ind. Code § 35-46-1-15.1(1).

[39] Mackey claims that the evidence used to convict him of invasion of privacy, i.e., the telephone calls, text messages, and instant messages sent to J.H., established both the behavior that violated the protective order and the behavior that established the stalking. Mackey, however, overlooks that an additional evidentiary fact needed to be proved to establish the invasion of privacy—the

---

[6] Stalking "does not include statutorily or constitutionally protected activity." Ind. Code § 35-45-10-1.

existence of a protective order. Because the State had to establish the existence of a protective order that was violated, the evidence used to establish the stalking did not also establish *all* of the elements of invasion of privacy. Thus, no double jeopardy violation exists under the *Richardson* actual evidence test. *See Spivey*, 761 N.E.2d at 833 (clarifying that, there is no double jeopardy violation when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense).

[40] Mackey also contends that his conviction for stalking and harassment constitute double jeopardy under the actual evidence test. The State concedes this, and we agree. To convict Mackey of harassment, it was required to prove that he made telephone calls to J.H. with the intent to harass, annoy, or alarm her, but with no intent of legitimate communication. Appellant's App. p. 38; Ind. Code § 35-45-2-2(a)(1).

[41] As noted by the State, to establish this offense, the State did not need to prove the existence of the protective order. Instead, it simply relied upon the communications Mackey made with J.H. The record does not indicate the State relied on any specific unique communication in support of the harassment charge that was not also relied on to prove Mackey's course of conduct in stalking J.H. In other words, the actual evidence used to establish Mackey's conviction for stalking also established *all* of the elements required to convict him of harassment. This constitutes impermissible double jeopardy under the

actual evidence test, and we therefore reverse Mackey's conviction for Class B misdemeanor harassment.[7]

## Conclusion

[42] The trial court did not abuse its discretion in admitting into evidence the instant messages received by J.H., the out-of-court statements made by Mackey's ex-wife to J.H., or the testimony regarding the tire-slashing incident. However, Mackey's conviction for both Class C felony stalking and Class B misdemeanor harassment constitutes double jeopardy under the actual evidence test. We therefore reverse Mackey's conviction for harassment and remand with instructions that the trial court vacate the judgment of conviction and the sentence entered thereon.

[43] Affirmed in part, reversed in part, and remanded with instructions.

Kirsch, J., and Brown, J., concur.

---

[7] Since Mackey's sentences were ordered to be served concurrently, this will not affect Mackey's aggregate sentence.